Mr. Shapiro, whenever you're ready. Thank you. May it please the Court, my name is Alexandra Shapiro and I represent Appellant Michael Mendlowitz in this appeal. Mr. Mendlowitz was convicted of fraud because CPS, his credit card processing company, overcharged certain of its merchant customers. But CPS's sales and billing practices varied widely and many were consistent with industry practices and implicitly or explicitly approved by its parent company and majority owner Evo Payments. The key issue at trial was thus whether Mr. Mendlowitz acted in good faith, whether he knew about and sanctioned deceptive sales tactics by some of his sales people or instead whether he believed CPS's practices were consistent with industry practice and Evo's own practices. But his efforts to present that good faith defense were derailed by three clear legal errors committed by the district court. First, the court refused to allow the questioning needed to ferret out potential anti-Semitic bias by prospective jurors. That questioning was required by the Constitution on the particular facts of this case, which involved a defendant who was an observant Orthodox Jew and had been charged with engaging in fraud with Jewish colleagues while bestowing favors on Jewish friends, charges that play into pernicious stereotypes about Jewish people. Second, the district court erroneously excluded Mendlowitz's sole witness, an expert, Patrick Moran, who would have testified about industry practices that bolstered his good faith defense. Third, the court excluded an exculpatory recording on the erroneous premise that a witness who had participated in the recorded conversation could not authenticate the recording and then defended the post-trial, the ruling post-trial based on a misunderstanding of the hearsay rules. Judge Temple, you appreciate that we defer to the district court on Bardeer heavily. We defer to them. So you want to explain to me how the district court's Bardeer questioning failed to get a fair jury and that it not only that, but became structural error on the trial? Yes, Judge Bohler. It is true that this court defers to the district court's exercise of discretion in conducting Bardeer. However, the Supreme Court has clearly held that where there are substantial indications of a likelihood of racial or ethnic prejudice in a case based on the particular nature of the facts and the charges, the denial of a specific request to inquire into that constitutes an unconstitutional abuse of discretion. And our position here is that on the unique facts of this particular case, this is what happened. Counsel requested two specific questions to get directly at the issue of whether any juror harbored anti-Semitic biases about Jews in finance that could have led to a juror not being impartial, and the judge refused to make that inquiry. But the judge didn't simply refuse to make the inquiry, right? The judge initially was going to make the inquiry, and then the government objected that, oh, this suggests that he's being prosecuted because of religious bias, and so we don't like the way the questions are. Then the judge arrived at the question, does something about his physical appearance, there's something about his physical appearance that would prevent you from being fair, right? So the judge did ask that question. Well, he asked a question about physical appearance, but that didn't get at the issue of whether or not he was wearing a kippah and that, you know, he thought that, you know, his religious identity. But you're saying that there might be other jurors who did not understand the question. Correct, Your Honor. And indeed, that exchange occurred at the sidebar, so other jurors wouldn't have heard it. And moreover, I'd point out that that juror was then struck for cause. And so had the court made the inquiry of the other jurors, it could well be the case that others might have been struck as well for similar reasons. If I may, perhaps I can address the expert issue a bit. I think that the court's ruling on the expert issue is clearly erroneous. The court committed several legal errors. It, for instance, concluded that the expert's testimony wouldn't be relevant because it didn't go directly to Mr. Menlewitt's state of mind when, in fact, it's well settled that an expert can offer testimony that's relevant to a defendant's state of mind, obviously, without having personal knowledge of the defendant's state of mind. And in this case, there were a number of things the expert would have testified to that never emerged during the testimony of any of the defendants. And this is, or that the general practices of the industry would be these kinds of heavy-handed tactics that might even amount to misrepresentations, but that it was common in the industry? Well, it's a little more specific than that. I would say there are three key points that didn't come out in testimony of any faculties that the expert could have provided. The expert could have provided color on the typical practices of disclosure of fees, surcharges, changes to those fees that a juror could have been, from which a juror could have inferred the practices of CPS were consistent. In addition, he would have provided testimony that when, for instance, a fee... So why would that have shown that the practices were consistent? Because it would have shown that it doesn't really matter what you're presenting about the fees up front because you can always change the contract through a statement to... That's one of the points. And in addition, the expert would have specifically testified that it's generally understood in the industry when, for instance, fees are changed and the merchant continues to process payments, that that's viewed as an understanding by the merchant that they have accepted the new terms. For instance... But they're really inconsistent with the conclusion that there was fraud up front about leaving somebody to sign the deal? The fact that you could sort of change the terms later through a statement or through a sort of tacit consent by continuing to process payments doesn't necessarily show that you didn't have a state of mind consistent with fraud when you were closing the deal. That's certainly true, Your Honor, but there are two aspects to this case, and this is, I think, very important to emphasize. So there were, we readily concede, there were some salespeople who engaged in deceptive tactics. There was a key question... The key question was, didn't Mr. Mendelowitz know about that and did he sanction it? But separate and apart from that, the government heavily emphasized the general practices of the company, the idea of raising the rates after the initial contract by means of statement messages and other things like that. And it was critical to his defense, so he, you know, not only to be able to demonstrate that he did not sanction the specific misconduct that some sales reps were engaged in from time to time, and I also want to emphasize that the evidence as a whole was quite clear that, including the testimony of some of the cooperators that... the operators, then how does the evidence really show the state of mind? So if he had sanctioned this, you know, maybe the evidence would be relevant to make sure that actually he was promoting practices that are common in the industry, so maybe he didn't think he was defrauding anybody. But if the argument is that he didn't know that they were making misrepresentations, then what do the industry standards tell us about the state of mind? Well, there are really two points here. I think on the one hand, you have a few... you have some specific instances of reps... You're making both points. You're making... Those points were central to his defense, and the expert obviously wouldn't have spoken to the point your Honor was addressing. He would have addressed the other issue, but that doesn't mean he should have been excluded, because he couldn't... And I do want to highlight... The practices that he did endorse, you could show that it was consistently industry norms. Exactly, your Honor. And I just want to highlight that there was plenty of evidence in the record that corroborated his good faith defense in the form of emails and actual documentary evidence and even a recording, whereas the government's claim that he sanctioned and knew about these... that everyone agrees were improper, almost exclusively came from these cooperators who had tons of baggage and could easily have been discredited by the jury. And I just... I'll just direct the Court to a couple of examples. For instance, he tried to correct or prevent certain errors in discrepancies between what the sales team was saying and what was actually being charged to the customers. And there's an example of that at Appendix 636. He repeatedly reprimanded sales people for creating too many accounts, Appendix 609 and 224 to 25. He also stepped in to correct mistakes in the so-called onboarding process. And there are examples of that at Appendix 499 to 504. And finally, you know, there's a recording in which he is asked by one of the cooperators, Mr. Devers, about raising assessments, and he says, you can't just raise assessments, you have to do a statement message. That's at Appendix 627, all of which is to say there was ample evidence, you know, obviously we're not making a sufficiency argument here, but there was ample evidence from which the instances of lies that he was not sanctioning that, wasn't aware of it, but that the government, the jury could easily have accepted the government's arguments about the overall supposed problems with disclosure, and the expert could have spoken to that. Counsel, would we be doing Mr. Mandelowitz a real favor since he got a fabulous sentence? The range was 135 to 168 months, and he was sentenced to a year and one day? Well, Your Honor, I think the sentence certainly reflects, apart from the district judge's obvious view that the sentence should be lenient because of all the evidence presented about Mr. Mandelowitz's character at the sentencing, I would submit that perhaps it reflects also a notion of, I mean, I guess at the end of the day, I think the sentence is a separate issue. Of course. I mean, he was very fortunate to have received a low sentence, but that doesn't defeat the merits of his arguments that the trial was unfair. Fair enough. I said that's fair enough. Thank you. Okay, so we'll hear from you again on rebuttal, but let's turn to the government, Ms. Kamal. May it please the Court, Jelan Kamal, Assistant United States Attorney, here on behalf of the government. And I represented the government before the trial court as well, along with the rest of the trial team. Why did you object to the voir dire questions that this defendant proposed? Your Honor, the government objected not to inquiry regarding bias or prejudice, which Judge Broderick certainly engaged in multiple times and in many different ways, but the questions proposed by the defense risked injecting into the proceedings needlessly pernicious stereotypes about Jewish people, as well as the fact that those stereotypes and that potential prejudice really was not triggered by the facts and the circumstances of this case. Well, the question could be discussed. I mean, he thought that there was going to be a bias against him. That's why he made the request, right? So his position would not be that he was injecting a bias. Right. It was part of the case. And he was Jewish. Many of the people who worked with him were Jewish. He had a separate list of his platinum clients who were members of his congregation at his daughter's Jewish school, and that was all part of the evidence that the jury heard. He was not objecting it. It was there. With respect, Your Honor, one factual clarification may help the panel here. Mr. Mendelitz was charged along with six others at CPS. So it was Mr. Mendelitz, two of his chief lieutenants who, yes, were in fact Jewish, but Stefan Mahavir, one of the cooperating witnesses, was not Jewish. David Devers, his head of customer service who engaged in all of the rate hikes at Mr. Mendelitz's direction, he was not Jewish. Ben Bienvenido-Kaban, another testifying witness from CPS on behalf of the government, he was not Jewish. There was no suggestion here, Your Honor, that religious affiliation was something that bound the defendants, that it in any way animated the fraud in any way. I object to the order on the ground that it might suggest that the prosecution was motivated by religious bias. If it was honest, there was no such suggestion. You know, Your Honor, the concern that injecting the, that, let me take a step back. What the court, what the government objected to was the precise language and the precise questions that the defendants asked for. I apologize, Your Honor, I didn't catch that. So did you offer an alternative if you didn't like the precise language? We did not, Your Honor, but when the court crafted its own language that was specifically addressing the particular personal characteristics of the defendant that it considered to have the potential to trigger prejudice, we did not. Tell me about this defendant's physical appearance, or what he was referring to as an article of clothing. Your Honor, the defense was the one that, was the party that characterized the defendant's physical appearance as the relevant fact that would trigger a juror's potential bias. So Judge Broderick was in fact being very deferential to the defendant's particular concerns, which were that his appearance was going to signal, was going to signal his religious affiliation. And Judge Broderick also crafted a question that placed the defendant's physical appearance in the context of the particular charges, which were financial charges. And Judge Broderick's questioning specifically linked those two together. And the proof, Your Honor, is in the response of the, you know, potential juror number 26 who approached the court at a sidebar and validated the court's approach, that he understood what type of prejudice the court was getting at. But importantly, Your Honor, here, there is nothing in, there is nothing in the controlling precedent, either in the circuit or in the Supreme Court, that requires a district court judge to use the precise language that is proposed by the defense. Of course not. Judge Broderick may be including that the judge used their precise language, but they are claiming that what the judge did was too generic to capture the anti-Semitic tropes that are so prevalent today. With respect, Your Honor, Judge Broderick crafted his questions in specific and direct response to the specific concerns that were raised by defense counsel. Defense counsel pointed out that it was Mr., it was Mr. Mendlowitz's physical appearance that was going to be the tell that he was religiously observant. He also mentioned that it was the charges in this case, because they involved financial crimes and fraud, that were going to have the potential to trigger the potential bias that he was concerned about. And Judge Broderick's questions specifically addressed that. And more to the point, Your Honor, when Judge Broderick explained his reasoning, he was very clear that he was loathe, as was the government, to see the injection of these stereotypes into the veneer when the facts of the case, they were not inextricably intertwined with the facts of the case. And the concerns he articulated are those that were frankly articulated by the Supreme  And I'm going to go back to Justice Rehnquist, where he said, Your Honor, and if I may, I would quote, you know, an inquiry in every case is likely to create the impression that justice in a court of law may turn upon the pigmentation of skin or the accident of birth. And then he added, trial judges are understandably hesitant to introduce such a suggestion into their courtroom. Now, Justice Rehnquist was obviously talking about race in that particular context. And yet the context of that case, of Rosales-Lopez, were even more inflammatory than anything that could possibly be at issue here. I think it's a perfect analogy to talk about race in one context and religion in another one. I mean, Mr. Mandelowitz wore his religion in his outfit in what he looked like. And I don't think the judge got at that at all by talking about appearance. By getting at appearance, but Your Honor, it was the defense counsel's suggestion that it was the defendant's appearance that was going to signal his religious affiliation. So Judge Broderick here was very solicitous of the defense's concerns. The questions that he did craft were clearly effective because we have a prospective juror that got the message and approached the bench at sidebar and was appropriately struck. And so respectfully, Your Honor, no law, no case in this circuit or in the Supreme Court requires anything more of the district court with respect to the voir dire. Can I ask about the expert testimony? So is it relevant if Mr. Mandelowitz could show that these were practices that are common in the industry? And so to the extent that he wanted to have more aggressive sales tactics, he was just trying to conform to industry standards. So, Your Honor, the short answer to that is expert testimony, this expert testimony, was not going to be relevant to the defendant's good faith defense. The context in which this circuit has admitted expert testimony regarding industry standards is where the expert testimony is going to help the jury evaluate whether or not a misrepresentation or a practice is material. So if he's trying to come up with more aggressive sales tactics that are being argued that they're competing, but actually it turns out that that's the industry standard and everybody kind of understands that there's a lot of aggressive sales tactics, but contracts are Not necessarily, Your Honor, because the defendant has to be aware of what those industry practices are. And here, the practices that were relevant were the practices of his company. There could have been testimony, Your Honor. There could have been documents, right? He was the CEO of a processing company for eight years, right? He was. So it's not implausible that he would have known about the practices of the industry. It's not implausible, Your Honor, and certainly such evidence could have been introduced, and on such a record, maybe the outcomes here ought to have been different. But on this record, where there is absolutely no suggestion, there's no other evidence in the record that Mr. Mendeleev was aware of. Is that relevant because you don't think Mr. Mendeleev knew about the industry practices? Well, it's two things, Your Honor. On the one hand, it's not relevant because there's no indication that he did know about the practices of other companies. But on the other hand, Your Honor, under Federal Rule of Evidence 702, expert testimony must be deemed helpful to the jury. And here, all of these industry practices that the defense claims were so central were testified to by multiple witnesses. And in fact, this was actually uncontroversial evidence. The fact that credit card companies or merchant card processors communicate changes in rates through statement messages on statements, this was not a point of controversy in any way. What made statement messages relevant at all in this particular prosecution was the fact that customers who had been promised that their rates and fees would never change were also surprised. And then you could change it with a statement on the back end. I understand that. It's not inconsistent, as I've said. But if he had testified that actually the practices, the upfront sales practices that would be probative of whether he was trying to conform to industry practices as opposed to trying to defraud customers, right? If I were a juror, it seems to me that might be helpful if I knew that this is the way this industry operates. On different facts, Your Honor, where the mix of evidence from precipient witnesses, from fact witnesses was different, maybe that would be the right call. This is why such determinations are committed to the district court's discretion. But here, where the particular practices of the defendant's company were before the jurors, where there was robust cross-examination. My question is, why are the particular practices of that company a replacement for testimony about the way the industry operates? So it might be that that company is idiosyncratic. And so from the point of view of that company, he looks like he's being aggressive. But if you look at industry practices, he's actually not out of the norm in terms of detailed practices. I mean, isn't that possible? So why is the testimony about the particular company a replacement for understanding how the industry functions? Because here, Your Honor, there was no link between the defendant's knowledge and the general practices in the industry. I mean, that is the very point that he had been running his own company for eight years, right? He had his own practices. And based on the defense theory at trial, he reported to Evo, a particular company, that was the 80% owner, ultimately, of his company. And so the larger industry practices, Your Honor, at a certain point, they're simply cumulative, to be sure. There are other cases with different- It turned out that Evo was a stickler about telepractices or something for some reason. But everything many of us wanted to do were actually done by 30 other companies, exactly the same way. Wouldn't that make a difference in the case? I mean, that's not the evidence, but he was deprived of even putting on any evidence that goes to this question. Briefly, Your Honor, if he were aware of the practices of those 30 other countries, if there were an email introduced that showed that he was routinely going to conferences and he corresponded with others and there he is corresponding with other CEOs of merchant processing companies about their relative approaches, it's at least something to prove that there was some link between the two. But the 403 balancing that Judge Broderick engaged in here appropriately considered whether injecting general industry practices when the jury already had plenty of evidence before about the actual practices of the defendant's actual company and his actual knowledge, it was ultimately cumulative. I apologize, Your Honor. I apologize for interrupting. Not at all. The point of the proposed testimony was that this defendant didn't deviate from the general practice. That was the point of putting on this witness, which was not allowed. Respectfully, Your Honor, this witness would not have testified to the defendant's company's practices relative to general industry practices. At the end of the day, this expert was simply there to provide testimony about general industry practices, not to compare those practices of the general industry. Well, it's the jury's job to compare it, to hear what they heard about the practices in this case and the general practices. And he was not allowed to do that. Your Honor, if I may, it's important to note just, frankly, just how cumulative and therefore arguably harmless this expert's testimony was. There is no particular argument that the defendant was unable to make because Mr. Moran did not testify. The defense submission goes on at length and relies on the evidence of at least four government witnesses from Evo and from the defendant's company, all of whom speak to uncontroversial industry practices. All those arguments were made. They were made based on the record evidence, and the defense was not foreclosed for making them. Can I ask about the recording that was excluded? Certainly. So Mr. Goodwin says, at the suggestion that they could sign every page, you know it would be a little bit more intrusive. Now, that's not being introduced for the truth of the matter asserted, right? It's not being introduced to prove that it would be more intrusive if they were required to sign every page. So that's not what you're saying, is it? If it's being used for the claim, you're right, Your Honor. If it were being introduced to say, to support an argument whether or not the practice was in fact intrusive, that would be hearsay, but that was not the purpose of introducing it here. So it's a mistake you're saying that it's hearsay? That is not the case. It was hearsay here, Your Honor. You just said it was not hearsay. I apologize, Your Honor. You're correct. Okay, so it was a mistake to say that it was hearsay. So did the district court make a mistake in excluding the testimony or the evidence? That, it did not, Your Honor, because of the use that the statement was going to be put to. The exceptions to the hearsay rule under 8033... You don't even accept the hearsay rule because you just said it's not hearsay. Well, it's not being used, but there are limits to the permissible purpose that the statement can be used for. If it's going to be used for, if it's going to be used as proof of the defendant's state of mind, the cases in this circuit impose a contemporaneous requirement. I understand that argument, like it was after the fact, some months later or whatever, but that just goes to the weight of the evidence, right? It's not invisible. Well, Your Honor, I mean, I believe that the circuit's decision in Harwoods holds that where the statement is being used is admissible as non-hearsay for state of mind at point A. A defendant can't then use that to make an inference about what the state of mind was at point B because that would effectively, that would gut the limitation that the non-hearsay use of such statements must be forward-looking. You mean like you can't retrospectively explain the state of mind of your earlier points? Exactly. But you didn't say it. You didn't say at the time I made this decision, this is what I was thinking. You just said at that time, it would be a little bit more intrusive. So the argument would be, well, you know, a couple months later, in explaining the decision, you said it would be more intrusive. That seems to be his belief that you could infer that that was his belief earlier. I mean, it doesn't necessarily, you know, maybe that's weak evidence. I mean, you might say it doesn't prove very much, but doesn't it lead to that inference? I mean, he's not trying to correct the record by saying what he thought at an earlier time. He's having a conversation with this guy about this practice. Your Honor, the district court's ruling here is obviously a closer call because the statement itself is susceptible of multiple interpretations and is arguably ambiguous. And as you pointly point out, Judge Minasci, it doesn't necessarily have particular probative force for the point that the defendant wanted to make. But that's all the more reason why the district court's decision to exclude this evidence was completely harmless. So it's harmless, why? Because it just doesn't have a lot of probative force. It does not have any probative force, not only because it's ambiguous, but also because of the point of time in which it's made. Why is it ambiguous? Well, because the purpose... It is unclear from the face of the statement whether it is expressing... I mean, it's unclear from the face of the statement what, if anything at all, it suggests about the defendant's state of mind or intent when he agreed to put in place the auto-signing feature. And that was the use that the defense wanted to put it to. So you're saying that it's not very probative. But it's not ambiguous. I mean, he's saying that if he required them to sign it, it would be more intrusive for the customer. Right? Right. It could be more intrusive in the sense that it could kill the deal because they would see all the terms. Or it could be more intrusive simply in that it would be more time-consuming. If something would kill the deal, you wouldn't call it intrusive, right? You'd say it would prevent them from signing the contract. Or doesn't intrusive go to whether it's convenient for the customer? I think arguably, Your Honor, your question goes to the heart of the ambiguity here. The statement has multiple interpretations. At the end of the day, it was not particularly probative of the defendant's intent or state of mind. It certainly couldn't shed any light on practices that he had carried out for the prior six years before his fraudulent scheme had begun to be detected by Evo. And so respectfully, Your Honor, the government maintains that if there were any error in excluding the statement, it was harmless. Okay. Thank you very much, Ms. Kamal. We'll turn back to Ms. Shapiro. Thank you, Your Honor. Just a couple of quick points on each of the issues. First, with respect to the voir dire, the defendant did not ask for a question about physical appearance. He objected to it. That's at Appendix 140 to 143. And the judge's question didn't even make sense, much less get at the issue in question. He talked about whether a juror might be impacted by the defendant's physical appearance in a financial case. It just doesn't even really make any sense, much less get to the problem that was present here. And moreover, with respect to the issue of the notion that asking the question might actually cause its own problem, the Supreme Court in Rosales-Lopez, in a different passage that my friend did not talk about, specifically said, it is usually best to allow the defendant to resolve this conflict, meaning the conflict between that potential problem and the problem of ferreting out the prejudice, by making the determination of whether or not he would prefer to have the inquiry into racial or ethnic prejudice pursued. And that was not done here, and the district court's basis for not doing it was invalid. With respect to the expert, as the cases we've cited make clear, relevance is a very low bar. This court has repeatedly said that. Here, as Judge Menasci pointed out, the defendant had eight years' experience in this company. There was ample basis. Just based on that alone, the jury certainly could draw an inference that he was aware of industry practices. He had been dealing with Evo, another company in the industry. The Litvak case, which is... The government said that there was no... It's harmless because there was no argument that you could have put on that you didn't get to put on that testimony. So what is the argument that you would have made had the testimony been made that you were denied the opportunity to... Well, there were a number of things that, as I mentioned in my earlier argument and of our reply brief, that the expert would have addressed that were not addressed by these other witnesses, including the division of responsibility between Evo and CPS and how that type of relationship typically plays out in the industry, where by the parent company would typically approve every single statement message that goes out. Again, there was no testimony regarding standards... What his state of mind was when he was requiring certain practices. Well, to the extent that the parent company was approving and was aware of CPS's practices and was approving it, that would have supported his argument that he believed what they were doing was in good faith. In addition, he would have provided a lot more detail around the standard industry practices about disclosure of changes in rates, fees, surcharges, and the appropriate way to disclose them to merchants in the industry as a whole. Again, that wasn't presented by any of these witnesses. And there was no testimony, as I mentioned earlier, about the industry understanding that merchants who continue to process payments after fees were changed were understood to have accepted those terms. I also want to... Well, I think, you know, the question is disclosure. What is an adequate disclosure? And, you know, what sort of violates the line and is misleading or a lie? And a lot of the practices here, as I mentioned earlier, were not out. Most of the case, most of what was going on at Evo wasn't about outright lies. Indeed, there were many mistakes. And at the Fatico hearing, it emerged, and this was also borne out by the audit, that there was a lot of underbilling as well as overbilling. And I just raised that to just point out that there were widely varying practices. And I think the... So the expert's testimony about, you know, what and when some of these changes of fine print needed to be disclosed and how that was done in the industry as a whole was relevant, particularly because the jury could have drawn an inference that Mr. Memolis was aware of that. And, indeed, in the... What I was going to say earlier was that in the Litvak case, there was no evidence, and the court pointed this out in a footnote, there was no evidence that the defendant there specifically knew about the excluded testimony that supervisors of other employees had sanctioned some of the practices that he was engaged in, but that, nonetheless, the expert shouldn't have been excluded. But the expert was not going to testify that the industry practice was that when customers were solicited with the promise that such and such a charge would never be made or that a rate would never be raised, that never did not mean never. Was he? That's correct, Your Honor. And as I mentioned in my earlier argument, there obviously were two different aspects to the case. One question was, like, did Mr. Memolis, you know, sanction that type of behavior to the extent it was occurring at times from the salesman? And there was certainly ample evidence indicating that he did not. And one example is that there's... Well, I mentioned a number of examples earlier, and there are others in our brief, but I think... So it was relevant to which point? So it was relevant to the government's argument that a lot of these other practices around disclosure were fraudulent. So obviously an expert couldn't tell you... In terms of conditions for being communicated. What was appropriate to communicate in terms of conditions or statement messages, things like that? What was standard in the industry? Because a lot of the government's arguments were based on attacking disclosure practices that were, this expert would have said, standard in the industry. Okay. Why don't you talk about the recording that was included? Yeah. So I want to highlight that notwithstanding, you know, my friend's arguments that the recording wasn't probative. The government now seems to be conceding that it wasn't hearsay. The government fought very hard to keep the recording out and focused on this auto-population issue. It closed the case with a witness who testified exclusively about this issue. It argued in closing about the issue forcefully, mentioned a recording that Mr. Menkowitz's voice was on involving this feature and talked about how important it was because it was his own voice. And yet the defense was not able to counter that in any way when this recording certainly would have been up to the jury to conclude. But it certainly, one could infer from what he said there that the reason it was originally implemented, the feature, that is... Even if it was a mistake to, an error to exclude it, why isn't it harmless? I mean, it is him saying something once after the fact, after he made a decision, and it could be a self-certification. It's not really obvious how relevant it is and why. Well, again, I think that the reason it's not harmless is that the government focused on this auto-population feature in its case, raised the issue in closing as an important issue for the jury. The jury also even sent out a note requesting the recording that the government was allowed to introduce during its deliberation. So that shows the jury was concerned about the issue. And finally, I'd just point out, as we argue in our brief, that an alternative basis would be to find cumulative error and taking together the exclusion of the expert and the exclusion of the recording to pride Mr. Menkowitz of a fair trial. Okay. Thank you, Your Honor. Thank you very much, Ms. Shapiro. The case is submitted. We'll hear argument next in numbers 21-23 and 21-24, United States v. Cedar. And we'll wait a minute for counsel to come up to the front of the room. Okay. Mr. Appleton. Thank you. Good morning, Your Honors. I'm Robert Appleton from Olshan Froma Wolofsky on behalf of Defendant Chaz Dear. May it please the Court, this is an appeal by Defendant Dear on both on the denial of his motion to suppress evidence, that is, the particular firearm that was seized at without a hearing, and also an appeal of his sentence. Two issues with his sentence. One, the judge's comment to sentencing, and also a four-level enhancement for possession of a firearm in connection with another offense. Addressing first the motion to suppress, the district court denied the motion to suppress. We respectfully submit there was absolutely zero probable cause to find a firearm in his house. The affidavit had no evidence that guns or drugs had ever previously been found in the house. The only evidence supporting probable cause was a paragraph in the warrant that alleged that the training and experience of officers is that drug dealers have firearms in their home. That's it. And there is no case. And the two controlled by. Can I address that? Of course. So the two controlled by's are, the record is incredibly sketchy. First, there's only one identification of this, of Mr. Dear, coming out of the back of the duplex residence. That's it. What the evidence was. Was he not identified as the seller? I'm sorry? Was he not identified as the seller in these two controlled by's? At a location a far distance away from the house. But he was, at that location, he was the one who was identified as the seller. Once. He was identified coming out of the house and traveling to the location of the by, which is unclear. It's clearly a distance away from the house, but it's unclear how he gets there. There's no evidence or facts in the record about whether. He didn't know anywhere else. There's a sentence in the affidavit that says they followed him. That's it. A sentence. Did he drive? If he drove? Did he walk? Not clear. There's no evidence. You can explain why you think there might be some nuances to this. But just, if in fact the government follows him from his home to a controlled by and sees And then says, well, we followed him, and so we didn't know anywhere else. He went from home to a controlled by, and so he insured that he had drugs in his home. We also, based on our experience, know that drug dealers, that's where they use the drugs. Why is that not a problem clause? Or is there argument that that's not what we have here? That's a problem clause, but that's not what we have here. Well, no. My argument is, A, it's not what we have here, but B, you can't infer that there's evidence in a home, in a home, which is the most sacred Fourth Amendment of a wider location, in a home without facts and evidence. It might be hypothetical if he went from his home to the drug deal and sold drugs, and the police observed him, or the authorities observed him the whole way, and he didn't go anywhere else in between. That would not be a problem clause, would it? The reserve for the home? No. First of all, if I can correct the record, the evidence is he went from the back of the home, outside of the home. He was seen outside of the home traveling to the location. That's it. He wasn't seen in the home. There's no drugs seen in the home. There's no, typically in these warrants, you have a C.I., a confidential informant, saying, I saw drugs or contraband in the home. You don't have that here. You have nothing. You have him being seen going from the back of his home to the location, and that's all. That's all. You don't have him coming out of the home with drugs. No, that's not exactly all. The buyer turned over some material to the cops after he did the buy. We're not disputing that there was two sales. We're not. But those sales were occurred a far distance from the home. You're recommending that he didn't justify a search of his home. Correct. There's no probable cause to search the home for guns or drugs. And secondly... And that said, it's not a certain proof that he necessarily had drugs in the home, but isn't it probable cause to believe he might? No. No. Really? It's just sort of an arbitrary... Might? He's seen him traveling from his home to a drug deal, and it's just a kind of arbitrary belief that, you know, maybe he had drugs in his home. And why would you think that? There's no reason to think that at all. Well, respectfully, two things. One is, again, he traveled from the back of his home. No one saw him in the home. Second, we don't know if he took a car, which is most likely the case, could have taken the drugs out of a compartment in the car, under the seat, out of the trunk, out of the glove compartment. We don't know. There's only one sentence about the surveillance, and we were not allowed in evidentiary hearings to test what that information was. The judge denied the motion without a hearing. And then secondly, there's no case, respectfully, Your Honor, that supports searching of a home based on inference that he might have drugs in the home. There has to be facts that lead to probable cause. And secondly, our argument is that the warrant here material omitted critical facts that an officer associated with this task force, a parole officer, the defendant was on parole, he'd been visited in the home twice, once on October 15th, where there was a full search of the home just a couple of months before this warrant was applied for, that didn't see any drugs or contraband, nothing. That information is not in the warrant. Was that before or after the control five? Before. Before. After they saw nothing, he made two control fives. Well, I apologize. I think one control five was in September. And so one was before, one was after. But the point is that a parole officer who's referenced in the warrant, in paragraph 21, it's referenced in the warrant, the affidavit, the affiant, Edwards, communicated with parole officer Wallace. Wallace is the parole officer who had been in the home twice. No drugs. Once. Drug paraphernalia. Right. Well, there was a testimony of sentencing that he found drug paraphernalia, but he has no report that that was the case. There was no arrest. There was no violation of probation. And more importantly, that comes out of sentencing. It's not in the warrant. So you're saying that maybe it's not true that he found drug paraphernalia. But if, in fact, he did see drug paraphernalia, that makes it more likely rather than less likely that there were drugs in the home, doesn't it? No. Well, and also, I would respectfully submit, we're talking about a firearm. This warrant authorizes... The firearm was next to the drugs, wasn't it? Right. But the warrant authorizes a search of a firearm in the home. There's no evidence in Mr. Wallace's observation when he was in the home that there was a firearm, even if he saw drug paraphernalia. Assuming for sake of argument he found drug paraphernalia, there's no evidence he found a gun. This warrant authorizes search of a home for a firearm. There's no evidence anywhere. There's no evidence that the buys that he had a firearm. The CIA doesn't say he has a firearm. No one said they saw a firearm in the home. There's no probable cause for a firearm. Zero. There's nothing. There's no reference to any firearm. I have an argument. At the time, I would like to hear something about the sentencing against him. Sure. You can say a few words about that. Sure. Thank you. So at sentencing, there's two issues we raise. One is the first, when the judge came out of the bench and sentenced, or when she sentenced the defendant, she immediately referenced the shooting of a 14-year-old boy in Hartford and gun violence generally. And she specifically said, and also referenced a text message that came out, an interpretation of an agent who interpreted a text message that said that he testified that Mr. Deere had been involved in a shooting six years ago. So the judge comes out, says that, and she says, quote, We have seen the record, record gunshot deaths and injuries this year because of young people legally possessing and indiscriminately and vindictively firing firearms. This isn't a mere possession of a firearm case. This is a case which exemplifies the pain and suffering that we are experiencing in our cities in the state and around the country. The reference was to a 14-year-old boy shooting in Hartford. Mr. Deere was incarcerated. He was in jail for more than two years. He had never once been alleged to involve in any activity in Hartford. He's from Bridgeport. The implication of that statement is not that he was involved in the shooting of the boy in Hartford. I would respectfully disagree. What happened was that those comments were attributed to Mr. Deere as if he was responsible for those actions. He wasn't responsible for that. He had nothing to do with that. He had been in jail for plus two plus years. That was personified. If in fact he was using a gun to commit drug crimes, then that is just part of the general problem of gun violence. Well, the evidence that he was using a gun to commit gun crimes was not... That's what I actually wanted to hear about. So your argument is because the gun was found in the proximity of the drugs, it's not enough to infer that he used a gun to commit drug crimes. Correct. In fact, yes. Why is it not a reasonable inference that if the drugs are found and they're together with the gun, that when he went to do drug deals, he would be carrying a gun? Respectfully, there is one case in the circuit that does make that finding, but I would respectfully submit this is not that case. The drugs that were found in the home were minuscule amounts. We're talking about 1.6 grams of heroin, a tiny amount of cocaine. The sales in this case, the sales, the two controlled sales, were minuscule amounts of marijuana. I mean, this is not a major drug dealer. He was... There's... The government introduced a sentencing, a bunch of... I'm sorry. So you're saying that because of the quantity or type of drug, it reduces the plausible inference that finding a gun near the drugs means that he carried the gun while dealing the drugs? I would respectfully submit there is no evidence at all that he carried any gun while dealing drugs. None. None. Well, there was a gun. There is a gun in the house. No dispute. A gun in the house. There's no evidence that gun was used, possessed? Would it have been the use of a gun in the commission of a drug offense if he just carried it to the drug dealer? If that were the fact? If that were the fact, that would be enough, that if he just carried it with him. Perhaps. And so the inference here is the district court decided basically that because he had a gun right next to the drugs, that it shows that he would carry it with him when he was dealing the drugs. The district court found, yes, that the proximity of the gun to the drugs was sufficient to make that finding, and there is no, again. So I guess you're saying, because you're focusing on the type of drugs and the quantity, if it was a larger quantity of a more serious drug, you think it would have been stronger proof? Stronger proof. Without question. So we should just sort of say in general, we don't think for selling marijuana that you would carry a gun, but for other types of drugs you would. Why would that be? Isn't the inference based on the fact that the gun was there with the drugs? The inference is based on the fact that the gun was near the drugs. You'd have to have more. There'd have to be more. The cases that have found the four-level enhancement is appropriate have more than that. That's not enough. There's no evidence here in the record of any gun anywhere. Anywhere. There's no evidence of him carrying the gun to the buys. The CIA doesn't say he saw a gun on him. There's no evidence of any officers seeing it. But they didn't search him during the controlled buys so that he might very well have been carrying the gun to protect himself or the drugs, and they didn't search him in those cases. Isn't that correct? No. Well, respectfully, there is no evidence of what really happened at the buys. All that we have... Right, right. But he could have been carrying a gun. I mean, he had a gun, right? It would have been pure speculation, Your Honor. I know it would be speculation, but it's just as speculative to say there's no evidence he ever carried a gun. Respectfully, the proof is on the government to establish that. It's not pure speculation because it's based on the fact that he had the gun and kept it near the drugs. You're just saying that that is not enough to show my preponderance of the evidence that he had the gun and kept it near the drugs because he could have just left it at home. A gun was... Respectfully, a gun was found on the couch where this minuscule amount of drugs was found under the couch. It proves nothing. Did he have his own medicine in his apartment? Yes. Yes. And the gun and the drugs were found in the living room. Correct. Correct. And there's nothing else here establishing the farm was used in connection with the drug abuse. All right. All right, thank you very much. Thank you. We'll hear from the Honorable Muddle, but let's turn to the government. Ms. Kavazanis. Thank you, Your Honors. May it please the Court, my name is Jocelyn Cornyn Kavazanis and I represent the United States of America on this appeal. The District Court did not err when it found probable cause in the affidavit supporting the state search warrant, which resulted in the search of Chas Deer's apartment and the recovery of the gun and firearms. And I'd like to correct the record before I fully develop this argument on several points. The two controlled buys, to Your Honor's question, occurred after the visits. So the first visit, the first parole visit, is on September 23rd. Second parole visit is on October 15th. First controlled buy is on or after November 29th. Second controlled buy is on or about January 22nd. So they are significantly after those initial parole visits. As to what happened during those controlled buys, Your Honors can refer to pages 79 and 80 of Chas Deer's appendix, in which the affidavit is. But during those controlled buys, for the first controlled buy, Chas Deer leaves from the cartilage of the apartment and it states in the affidavit that the surveillance officers maintain constant surveillance of him until he goes to the meeting place. The second controlled buy, he exits from the meeting place. But they don't see his face, right? They don't see his face. They identify the person who exits the apartment as consistent in appearance with him. And then after the buy, the confidential informant says, I just bought the drugs from Chas. And later, after the second controlled buy, looks at a picture of Chas Deer and says, that's the person I bought drugs from on both occasions. So under constant surveillance from the apartment. Second controlled buy, he leaves from the rear door of his duplex, which is on the left side of the building, so specifically from his residence. Again, under constant surveillance. And again, conducts a marijuana sale. Again, it's turned over. And again, the confidential informant says he just got it from Chas Deer. Or from Chas, sorry. Just one other point of clarification in terms of the layout of the apartment. Chas Deer did not have his own bedroom. He shared a bedroom with his mother. But it is correct that the gun was found on the couch. So with regards to the probable cause that this warrant contained, it not only had these specific controlled buys, which tied Chas Deer to leaving from the residence, going and conducting the controlled buy. But then it had this paragraph regarding the experience and training of the two Affians, one of whom had 22 years of experience, the other one seven years. And they said that in their experience, people who sell drugs keep drugs and drug proceeds in their house and other things like firearms and ammunition for firearms. This combined together was enough to establish probable cause. Under Illinois v. Gates, it's a common sense decision. And the decision should be paid great deference by reviewing courts. Additionally and alternatively, the district court found that the officers relied in good faith on the warrant that was signed by a state court judge. Which was another basis to uphold the search. As for the search of a firearm, the record reflects that Chas Deer, so first of all, the warrant did contain information relating to the firearm and that it was in the experience of the Affians that firearms were found at the residences of drug dealers. But additionally, Chas Deer is arrested outside the house. He tells the officers there's a firearm in his house. They then go back and the firearm is on the couch. So it's not quite the situation where the firearm is arguably in plain view on the couch. And again, it's feet away from the drugs and other, in the cardboard box. As to the additional point on the omission of the two prior parole visits, those did not in any way undermine the probable cause determination. As I just stated to your honors, they occur, the first one is approximately four months before the second controlled by and over four months before the actual search of the apartment. The first visit, as your honor pointed out, was they went to charge the bracelet. It's just an open view visit. Second visit, they do do a compliance check. It is a search. But they do find drug packaging paraphernalia and a scale in the bedroom he shares. And additionally, they find the phone. And on that first phone, there is evidence of his drug trafficking. And that is combined with the drugs. Is that in the affidavit? No, it's not in the affidavit, your honor. So the fact, whatever they found on the phone was irrelevant to whether they had the right to search. That's correct, your honor. But I'm... But their position is even if they had included information about that in the affidavit, it would have only increased the problem. Exactly. Exactly. As to the point regarding the allegation that the district court somehow demonstrated bias by commenting on the shooting death of a 14-year-old in Waterbury, I mean, this is, the district court was contextualizing the sentencing. It was, she was applying the real world common sense, exactly what I think we want district courts to do. And she was... But this doesn't suggest the district court is worried a lot about gun violence and maybe is drawing inference that it didn't necessarily mean so. Why does the fact that the gun is just found in the house mean that he necessarily took it to the drug deal? So to get to that point, which is I guess more of a question on the enhancement. Enhancement, yes. Yes. That, so the fact that it's found in the house, it's found, as your earlier question was pointing out, it's found feet away from drugs that are packaged for distribution. So I think as an initial matter under United States v. Luder and other similar cases, you can infer from that proximity that it was used to protect the stash. And additionally, you should look, the case law suggests you have to look at the type of gun, the circumstances. Chazier is a convicted felon. He has a gun that's a semi-automatic firearm with an extended magazine feet away from the drugs. He's not an addict. There's no evidence that he himself is using the drugs. And again, I go back to the phone. The first phone demonstrates that he's dealing drugs as of October 15th. The second phone, when he's arrested on January 30th, demonstrates that he's been dealing drugs up until the point of his arrest. And if you look back in the appendix, there's even messages that suggest that he was meeting drug customers at 286 House Street, which is the empty lot across from his apartment. So the fact that he has the guns with the drugs, he's meeting customers there, he's dealing drugs, there's no other evidence of any other reason why he would have a gun. I think that's more than enough for a preponderance standard. Somebody might have a gun in the home to protect the home, but not necessarily bring it to the home. That's an argument that wasn't raised. But it's legal, you know, in New York State and the country. It's legal to have a gun to protect the house. Not if you're a convicted felon. Not if you're a felon. And certainly not a semi-automatic firearm with an extended magazine. I mean, there's simply no purpose to have that to protect the house, that kind of a gun. So here, it's not just the proximity, it's also the nature of the weapon. It's the nature of the weapon, it's the proximity, it's the demonstrated evidence of his drug dealing. And again, it's under a guideline which says that it has to be in connection with a felony, have the potential to facilitate the felony under the application note. You only have the potential to facilitate it. So if he just carried it and never used it, he still would be using the gun. Correct, under this court's precedent, under the United States, the SFS, and other such cases. And additionally, it's a preponderance of the evidence standard here, that the district court found appropriately at sentencing. So you're totally unimpressed by the minuscule amounts of the drugs that he had, as told to us by opposing counsel? No, Your Honor, because I don't think you can look at those in a vacuum. I mean, with the demonstrated evidence of his drug dealing over those text messages, and the fact that if there was some evidence that he was an addict, maybe it would be different. It's two different types of drugs. They're packaged for street-level distribution. I wouldn't necessarily describe them as minuscule. I mean, they're certainly not heavy distribution weight, but they're packaged for street-level distribution. And I think from the facts presented, the district court correctly inferred that by a preponderance of the evidence, there was sufficient evidence to support that enhancement. And if Your Honors have no further questions on any of these points, we would rest on our papers and ask that this court affirm the judgment of the district court and affirm the judgment of the district court. Thank you. Thank you very much. We'll turn back to Mr. Appleton and Honorable. Thank you. To raise two points, and I would like to rest on this court's precedence in prior cases. No court, this circuit has never upheld a warrant based on training experience of an officer. Again, the warrant authorized the search of a person's home for a firearm where there was no information or evidence at all of a firearm prior and in this affidavit. This affidavit references two controlled buys with no firearms anywhere seen or observed or alleged to have been used or carried. But isn't that enough that two controlled buys could do a search? Not at the home. If there's no evidence that a gun was in the home, it's not. Not for the gun. But isn't there enough evidence to do a search? No. No. I would respectfully submit no because there's no evidence that the officers saw the drugs in the home. In the home. They see him once traveling from the back curtilage of the house. There could be a million different ways. He could have had the drugs in the bush. He could have taken the drugs out of the glove compartment of the car. We don't know if he drove. We wouldn't allow him to. But the government has to establish probable cause that there is contraband or a firearm in the home. They had the warrant to search the bush. They could have gotten the warrant to search the bush. They could have gotten the warrant to search the outside of the house. So they could have gotten the warrant to search any of those things in the proximity of the rear of the home? Yeah. But isn't the home also in the proximity of the rear of the home? No. Respectfully, you're talking about going inside a person's home. Inside a person's home to do a search. There's no evidence. There's no statement. There's no observation. There's no controlled, no CI information that he was in the home and saw a gun in possession of Mr. Gere. None of that's here. It's a training and experience warrant. That's it. And there's no training and experience. The real experience is omitted because they didn't include the information from very close of proximity. I respectfully submit whether the buys are a week or two after the visit. They're all close in time. And good faith exception under Riley, which we cited in our brief, does not apply when there's a reckless omission of material information. So good faith does not. What would you have them include in the warrant to make it a no reckless omission? What would you have them include? They should have included that the parole officer, who's referenced in paragraph 21, had been in the house twice before and not seen a firearm. That should have gone into the warrant. That was relevant information. They cite on paragraph 21 of the warrant, Affiant Edwards communicated with parole officer Wallace, who informed Affiant Edwards that he had been inside Chaz Gere's residence at 277 Howe Street. Full stop. Nothing more. It should have been said when Mr. Wallace was in the home, he did not see a firearm. And he did not see drug paraphernalia. If he saw it, we don't know. It's still controversial. Whatever he saw. But isn't the implication of saying he'd been in the home and not saying that he had seen drugs or a gun, isn't the suggestion that he didn't see those things? Because otherwise it would have mentioned it. Correct. I mean, there's a suggestion he didn't see it. But he doesn't say it. He doesn't say it. And it's relevant information. Would a judge then authorize the search of a home if an officer on this task force had been in there twice and had not seen a gun? I don't think so. Well, I guess why wouldn't he? So let's say that there had been somebody in his home twice and had not seen the material. But then they witnessed him do two controlled buys. Why wouldn't they? At a location far from the home. Finally, now you're getting to the distinction about the home. I'm making a clear distinction here between inside the home, where the buys occurred, where the officers saw Mr. Gere. It all matters. It all matters because we're talking about a search of a person's residence. The Fourth Amendment protects homes as sacrosanct, as more secure than anything else. We're talking about going into somebody's home without probable cause. We have that argument. Thank you very much. Thank you. The case is submitted. And because that is our last argued case this morning, we are adjourned. Court is adjourned.